1    **WO**

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7                 FOR THE DISTRICT OF ARIZONA

8

9    Sandra Jauregui,                          No. CV-23-00729-PHX-JJT

10                   Plaintiff,                 **ORDER**

11   v.

12   Daimler Truck North America LLC, *et al.*,

13                   Defendants.

14

15          At issue is Defendant Daimler Truck North America LLC's ("DTNA") Motion to

16   Dismiss (Doc. 17), to which Plaintiff Sandra Jauregui filed a Response (Doc. 28) and

17   DTNA filed a Reply (Doc. 29). The Court finds oral argument unnecessary to resolve the

18   Motion. *See* LRCiv 7.2(f). For the reasons set forth below, the Court denies the Motion.

19   **I.      BACKGROUND**

20          Plaintiff filed this action on behalf of herself and all statutory beneficiaries of her

21   husband, Jose Luis Jauregui Soto. Mr. Soto passed away from injuries sustained in a

22   collision between trucks on Interstate 17 in Maricopa County, Arizona on May 20, 2022.

23   (Doc. 1, Compl. ¶¶ 3, 40, 50–62.) In her Complaint, Plaintiff alleges the following facts.

24          Mr. Soto worked as a truck driver for Shamrock Farms, a Phoenix-based dairy

25   company. (*Id*. ¶ 42.) Early on May 20, 2022, Mr. Soto picked up a load from Shamrock's

26   main facility and drove north on Interstate 17 in a 2022 Peterbilt semi-tractor truck

27   designed and manufactured by Paccar Inc. ("Paccar"). (*Id*. ¶¶ 17–25, 50–51.) The truck

28

was equipped with a collision avoidance and mitigation system designed and manufactured by Bendix Commercial Vehicle Systems LLC ("Bendix"). (*Id.* ¶¶ 26, 44–49.)

Another Shamrock driver had left the main facility shortly before Mr. Soto, driving in a 2018 Freightliner semi-tractor truck designed and manufactured by DTNA. (*Id.* ¶¶ 6-16, 52.) As he was driving north in the number two lane on Interstate 17, "the Freightliner began to unexpectedly slow down without driver input," and for reasons the driver could not determine. (*Id.* ¶ 53.) When he "attempted to move the truck over to the number one lane or shoulder," he "was unable to do so because the Freightliner would not respond. Rather, the Freightliner came to a complete stop in the number two lane on the Interstate highway." (*Id.* ¶ 54.[1]) After reporting the situation to dispatch, he exited the truck and stood on the shoulder. (*Id.*) By this time, Mr. Soto was only a few minutes behind, unaware the Freightliner had come to a complete stop in the same lane ahead. (*Id.* ¶ 55.) Despite being equipped with the Bendix collision avoidance and mitigation system, the Peterbilt truck did not provide any audible or visual alerts of the danger ahead. (*Id.* ¶¶ 56-57.) Nor did it slow down or utilize its adaptive cruise control capabilities (*Id.* ¶¶ 58-59.) The Peterbilt collided with the trailer of the Freightliner and caught fire, killing Mr. Soto. (*Id.* ¶¶ 60–62.)

Plaintiff brought suit against DTNA, Paccar, and Bendix in this Court, invoking its diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff asserts several claims under Arizona law: strict products-liability claims under alternative design and manufacturing defect theories against DTNA (Count 1) and Paccar and Bendix (Count 3[2]); negligence claims against DTNA (Count 2) and Paccar and Bendix (Count 4); and a wrongful death claim against all defendants (Count 5). Though Plaintiff initially sought punitive as well as compensatory damages, the Court dismissed the punitive damage allegations against DTNA without prejudice pursuant to a stipulation by the parties. (Doc. 27.) Paccar and

---

[1] Plaintiff further alleges, upon information and belief, that the "CPC3 Evo Module on model year 2018 Freightliner 'New' Cascadia has a problem at the chip level which causes the DDEC Report data to be lost, possibly due to power issues." (*Id.* ¶ 63.)

[2] Plaintiff misnumbered this claim as Count 4. (*See* Compl. ¶¶ 84–100.)

1   Bendix filed Answers to the claims against them. (Docs. 23, 24.) DTNA moves to dismiss

2   the claims against it under Federal Rule of Civil Procedure 12(b)(6).

3   **II.   LEGAL STANDARD**

4          Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v.*

5   *Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to

6   state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) the

7   absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v.*

8   *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for

9   failure to state a claim, the well-pled factual allegations are taken as true and construed in

10  the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067

11  (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is

12  plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has

13  facial plausibility when the plaintiff pleads factual content that allows the court to draw the

14  reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

15  *Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility

16  standard is not akin to a 'probability requirement,' but it asks for more than a sheer

17  possibility that a defendant has acted unlawfully." *Id.*

18         "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed

19  factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

20  requires more than labels and conclusions, and a formulaic recitation of the elements of a

21  cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up and citations omitted).

22  Legal conclusions couched as factual allegations are not entitled to the assumption of truth

23  and therefore are insufficient to defeat a motion to dismiss for failure to state a claim. *Iqbal*,

24  556 U.S. at 679-80. However, "a well-pleaded complaint may proceed even if it strikes a

25  savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote

26  and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236

27  (1974)).

28

## III.    ANALYSIS

DTNA challenges the adequacy of the strict liability and negligence claims asserted against it. District courts apply state law to products liability claims brought in federal court pursuant to diversity jurisdiction. *Adams v. Synthes Spine Co.*, 298 F.3d 1114, 1117 (9th Cir. 2002). Arizona courts draw a distinction between strict liability claims and negligence claims by way of the focus of the inquiry and the time frame in which it is made. *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 880–81 (Ariz. 1985). Specifically, "[n]egligence theory concerns itself with determining whether the *conduct of the defendant* was reasonable in view of the foreseeable risk of injury; strict liability is concerned with whether the *product itself* was unreasonably dangerous." *Id.* at 880 (emphasis added). Thus, "[f]or a plaintiff to prove negligence he must prove that the designer or manufacturer acted unreasonably at the time of manufacture or design of the product." *Id.* at 881. In a strict liability analysis, however, "[t]he quality of the product may be measured not only by the information available to the manufacturer at the time of design, but also by the information available to the trier of fact at the time of trial." *Id.*

### A.    Strict Liability Claim

"Although the doctrine of strict liability in tort imposes liability without proof of negligence, the law does not impose liability for every injury caused by a product." *Id.* at 878. "Liability exists only if the product was in a 'defective condition unreasonably dangerous,' defined as a 'condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'" *Id.* (quoting Restatement (Second) of Torts § 402A & cmt. g.) "A prima facie case of strict products liability is established by showing that when the product left the defendant's control, it was in a defective condition that made it unreasonably dangerous and the defect was a proximate cause of plaintiff's injuries." *Jimenez v. Sears, Roebuck & Co.*, 904 P.2d 861, 864 (Ariz. 1995).

Plaintiff here alleges in the alternative that the 2018 Freightliner had a "defective and unreasonably dangerous design" (Compl. ¶ 66) or was "defective and unreasonably dangerous because it contained a defect that [DTNA] did not intend." (*Id.* ¶ 70.)

### 1.  Design Defect

The Arizona Supreme Court has identified two tests that may be used to examine the existence of an unreasonably dangerous defective condition: the consumer expectation test and the risk/benefit analysis. *Dart*, 709 P.2d at 879. The consumer expectation test may be applied where an ordinary consumer has experience with the product and thus has a reasonable expectation of how safely it should perform. *See id.* at 878–79. The risk/benefit analysis generally applies where an ordinary consumer lacks experience with the product, and thus lacks a reasonable expectation as to its "safe" performance. *See id.*

As noted, Plaintiff here alleges that while driving north on Interstate 17, the Freightliner began to unexpectedly and unintentionally slow down and would not respond to the driver's control, eventually coming to a complete stop. Invoking the consumer expectation test, Plaintiff alleges based on these facts that

> [t]he Freightliner failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

> Consumers have a reasonable expectation that a truck will not simply slow down and stop in a moving lane of traffic on an Interstate highway without driver input. The Freightliner behaved in a way that violates reasonable consumer expectations.

(*Id*. ¶¶ 67–68.) Invoking the risk/benefit analysis, Plaintiff further alleges that "the harmful characteristics or consequences of the components or design of the Freightliner that caused it to slow down on the Interstate highway outweighed any the benefits [sic] of the design." (*Id*. ¶ 69.) Plaintiff alleges these defects existed "at the time [the Freightliner] left the possession and control of [DTNA]." (*Id*. ¶ 72.) In its Motion, Defendant argues these allegations are bare, conclusory, and insufficient to support the inference that "a design defect existed and caused the 2018 Freightliner to slow or stop." (Doc. 17 at 6.)

While Plaintiff's allegations are brief and somewhat broad, the Court finds them sufficient to state a design-defect claim. Plaintiff does more than merely recite the elements of her claim; she identifies a defect of unintended deceleration unresponsive to driver control. Plaintiff aptly compares her allegations to the multi-district litigation alleging

sudden, unintended acceleration ("SUA") in Toyota vehicles. In that litigation, the district court denied Toyota's motion to dismiss because it demanded "a level of specificity that is not required at the pleading stage." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prod. Liab. Litig.*, 754 F. Supp. 2d 1208, 1221 (C.D. Cal. 2010). The court observed the plaintiffs had identified a defect—SUA—and its causes—"an inadequate fault detection system and electronic failures." *Id.* The allegations were sufficient to support a finding that, among other things, the vehicles "do not meet consumer expectations because they suddenly and unexpectedly accelerate and cannot be stopped upon proper application of the brake pedal," causing crashes and injuries. *Id.*

It is true that Plaintiff here has not identified a precise mechanical or digital cause of the Freightliner's unintended deceleration. However, she posits that her allegations support the reasonable inference that the unintended deceleration may have been caused by power issues, consistent with the power issues that possibly caused data from the truck to be lost. Plaintiff will have the opportunity, through discovery, to try to substantiate this theory or to pinpoint another more precise cause of the alleged defect. For its part, DTNA will have the opportunity to substantiate the theory that the unintended deceleration may have occurred "for many reasons other than a defect, including improper maintenance, lack of fuel, and something the operator did or failed to do." (Doc. 17 at 5.) But the existence of such alternatives does not render Plaintiff's claim implausible at this stage. "The plausibility standard is not akin to a 'probability requirement,'" *Ashcroft*, 556 U.S. at 678, and whether Plaintiff can produce a sufficient quantum of evidence to support her claim is a question for a later stage of the case.[3] Ultimately, the Court finds Plaintiff's allegations sufficient to support the reasonable inference that, when it left DTNA's control, the

---

[3] DTNA argues Plaintiff cannot rely on circumstantial evidence to support her claim because use of such evidence is "limited to cases where the Plaintiff is unable to inspect the product, something which Plaintiff has clearly done here." (Reply at 3.) Setting aside that this argument implicates facts outside the four corners of the Complaint, both of the cases DTNA cites in support of this point involved application of the evidentiary standards on summary judgment, which are inapplicable at this stage. *See Amaya v. Future Motion, Inc.*, No. CV-21-08243-PCT-MTL, 2022 WL 17976319, at *3 (D. Ariz. Dec. 28, 2022); *Phila Indemn. Ins. Co. v. BMW North Am. LLC*, No. CV-13-01228-PHX-JZB, 2015 WL 5693525, at *15 (D. Ariz. Sept. 29, 2015).

Freightliner was defective in that it "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonable manner." *Brethauer v. Gen. Motors Corp.*, 211 P.3d 1176, 1182 (Ariz. Ct. App. 2009) (citation omitted).

DTNA argues the consumer expectation test is unavailable here, however, because Mr. Soto was not driving the Freightliner and was thus a bystander for purposes of the design-defect claim. In support, it cites *Gomulka v. Yavapai Machine and Auto Parts, Inc.*, in which the Arizona Court of Appeals held "[t]he consumer expectation test does not apply to bystanders, at least in design defect cases." 745 P.2d 986, 989 (Ariz. Ct. App. 1987).

In *Gomulka*, the plaintiff was severely burned when fumes from gasoline he was pouring inside a room in a mechanic shop were ignited by the pilot light of a gas-fired steam cleaner in a corner of the room. *Id.* at 988. The plaintiff had not recognized it as a steam cleaner; he had never seen one that was gas fired and did not know it had a burning pilot light. *Id.* Nor did he realize the fumes would travel along the ground, believing instead they were suspended in air. *Id.* He sued the company that sold the steam cleaner to the shop. *Id.* He alleged, among other things, that the steam cleaner was defectively designed "because it lacked devices to prevent flashback explosions," and "was not elevated to minimize the danger of flammable vapors being drawn to the pilot light." *Id.* In support, he obtained the testimony of an expert who opined, among other things, that "the average consumer or user does not understand that gasoline fumes are heavier than air or that they run along the floor and can be sucked into a pilot light by the draft created by the operation of the steam cleaner." *Id.* The trial court granted summary judgment for the seller. *Id.*

The Arizona Court of Appeals reversed, holding the plaintiff had presented sufficient evidence to support a triable claim. *Id.* at 990. The court held that the plaintiff could proceed only under the risk/benefit analysis, however, and that the consumer expectation test did not apply. *Id.* at 989–90. As to the plaintiff, the court noted,

> the steam cleaner was only an unknown object sitting in the corner of the room. Since he was not using the steam cleaner, had not purchased it, and was not interacting with it in any deliberate way, he was nothing but a

bystander with respect to it. He had no expectations about the inherent danger of the machine.

*Id*. at 989 (citations omitted). The court found this conclusion bolstered by the fact that "one who has no knowledge of the properties of gasoline fumes has no idea about how a product could be designed to minimize the risk of exploding such fumes." *Id*. at 990.

Mr. Soto was likewise a bystander with respect to the Freightliner. Thus, under *Gomulka*, "[t]he consumer expectation test does not apply to [him]." *Id*. at 989. That may not fully resolve whether the consumer expectations test applies to Plaintiff's claim, however. The rule adopted in *Gomulka* flows not from the lack of privity between the seller and the injured party,[4] but from the fact that a bystander "may be entirely ignorant of [the product's] properties and of how safe it could be made." *Id*. It follows that the expectations of someone in Mr. Soto's position cannot form the basis for finding the Freightliner defectively designed. The same is not necessarily true of the expectations of someone in the position of the driver, who would have experience with the Freightliner and reasonable expectations of how safely it should perform, including as to potential risks to bystanders.

Other courts have held bystander-plaintiffs may proceed under this approach. For example, in *Horst v. Deere & Company*, the Wisconsin Supreme Court rejected a reformulation of the test based on bystander expectations but recognized that "if a product is unreasonably dangerous in light of the expectations of the ordinary user or consumer and a bystander is injured, a strict products liability claim remains available." 769 N.W.2d 536, 552 (Wisc. 2009); *see also Gaines-Tabb v. ICI Explosives USA, Inc.*, 160 F.3d 613,

---

[4] It has long been held that a lack of privity does not prevent bystanders from bringing strict liability claims for injuries caused by unreasonably dangerous products. In *Elmore v. American Motors Corporation*, the California Supreme Court held:

> The public policy which protects the driver and passenger of the car should also protect the bystander, and where a driver or passenger of another car is injured due to defects in the manufacture of an automobile and without any fault of their own, they may recover from the manufacturer of the defective automobile.

451 P.2d 84, 89 (Cal. 1969). The Arizona Court of Appeals agreed "the doctrine of strict tort liability against the manufacturer and retailer should be available to the bystander as well as to the user or consumer." *Caruth v. Mariani*, 463 P.2d 83, 84 (Ariz. Ct. App. 1970).

624 n.10 (10th Cir. 1998) (recognizing that under Oklahoma law a "bystander plaintiff . . . must still prove that the product was less safe than expected by an 'ordinary consumer'"); *Dubas v. Clark Equip. Co.*, 532 F. Supp. 3d 819, 828 (D. Neb. 2021) (predicting the Nebraska Supreme Court would likely evaluate strict liability claims by bystanders under the "consumer-contemplation test"); *Masterman v. Veldman's Equip., Inc.*, 530 N.E.2d 312, 317 (Ind. Ct. App. 1988) ("If . . . a product is placed in the hands of a user in a defective condition that presents an unreasonable danger to foreseeable bystanders, and the unreasonableness of the danger is not contemplated by the user, we may properly say [that the product was in a defective condition not contemplated by the user].").

The question is whether *Gomulka* forecloses this approach. On the one hand, the Arizona Court of Appeals' language was broad, holding "[t]he consumer expectation test does not apply to bystanders, at least in design defect cases." 745 P.2d at 989. On the other hand, this language can be reasonably construed to mean only that the test cannot be based on the expectations of bystanders. This construction is well-grounded and consistent with the analysis of other courts. To the extent the plaintiff's evidence in *Gomulka* spoke to the consumer expectation test, it focused on the expectations of someone in his position as a bystander. But, as a bystander, he "had no expectations about the inherent danger of the machine." *Id*. Here, by contrast, Plaintiff's allegations focus on the driver of the Freightliner, who quite reasonably would have expectations about its inherent danger. *Id*. Indeed, as *Horst* recognized, "a user or consumer's expectations regarding a product will often include safety expectations relating to bystanders." 769 N.W.2d at 553. That would almost invariably be the case where the product is an allegedly defective truck unexpectedly decelerating on an Interstate highway. The Court therefore concludes that, despite *Gomulka*'s broad language, it does not preclude bystanders from arguing that a product is unreasonably dangerous based on the ordinary user's expectations of its safety.

### 2.    Manufacturing Defect

Plaintiff alternatively alleges that if the Freightliner's unintended deceleration was not a defect in its design, it was a defect in its manufacture. In support, Plaintiff alleges the

truck "was being used for its intended and foreseeable purposes," but was "defective and unreasonably dangerous because it contained a defect that [DTNA] did not intend, and, as a result, the Freightliner unintentionally and against driver input came to a complete stop in a moving lane of an Interstate highway." (Compl. ¶¶ 70–71.) DTNA's arguments challenging these alternative allegations are similar, focusing on Plaintiff's failure to allege how the Freightliner's unintended deceleration problem relates to its manufacture.

This Court has observed that "[i]n Arizona, the crux of a manufacturing defect claim is that the defective product differs from the manufacturer's intended design or from other ostensibly identical units of the same product line." *Baca v. Johnson & Johnson*, No. CV-20-01036-PHX-DJH, 2020 WL 6450294, *4 (D. Ariz. Nov. 2, 2020) (citation omitted).

> A plaintiff pursuing a manufacturing defect claim must identify or explain how the product either deviated from the manufacturer's intended result or how the product deviated from other seemingly identical models; thus, a bare allegation that the product had a manufacturing defect is an insufficient legal conclusion.

*Id*. at 5 (citation omitted). While it is true Plaintiff here does not allege a comparison of the Freightliner to its design specifications or to other seemingly identical models, it is not difficult to infer that unexpected deceleration was a result DTNA did not intend. Discovery will provide Plaintiff an opportunity to try to develop evidence that the alleged defect was the result either of a flawed design or flawed manufacturing process. At this stage, it is sufficient that Plaintiff's allegations support the reasonable inference that the Freightliner failed to meet ordinary consumer expectations given the identified defect, whether in its design or manufacture. *See Dart*, 709 P.2d at 878 (noting the consumer expectation test "works well in manufacturing defect cases where, almost by definition, the product contains a danger which the manufacturer did not intend and the customer did not expect").

## B.    Negligence and Wrongful Death Claims

Finally, DTNA argues Plaintiff's negligence claim must be dismissed because "the failure to plead a claim based on strict liability constitutes a failure to plead a negligent product liability claim." (Doc. 17 at 6–7.) *See Gomulka*, 709 P.2d at 990. DTNA argues

Plaintiff's wrongful-death claim must also be dismissed accordingly. *See McKee v. State*, 388 P.3d 14, 18 (Ariz. Ct. App. 2016) ("[T]he right to bring a wrongful death action exists only if the decedent would have been able to maintain an action for damages if death had not ensued."). Because the Court finds Plaintiff's strict liability claims adequately pleaded, it must reject DTNA's arguments as to her negligence and wrongful death claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds Plaintiff has adequately pleaded strict liability claims against DTNA under alternative design- and manufacturing-defect theories. Because DTNA has developed no argument for dismissing Plaintiff's negligence and wrongful death claims other than arguing her strict-liability claims are insufficiently pleaded, the Court declines DTNA's request to dismiss these claims.

**IT IS THEREFORE ORDERD** denying Defendant Daimler Truck North America LLC's Motion to Dismiss (Doc. 17).

Dated this 11th day of August, 2023.

Honorable John J. Tuchi
United States District Judge