**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sandra Jauregui, | No. CV-23-00729-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Daimler Truck North America LLC, *et al.*, | |
| Defendants. | |

At issue are three related *Daubert* motions addressing the parties' respective "human factors" experts. First, Defendant PACCAR Incorporated (Paccar) and Defendant Bendix Commercial Vehicle Systems LLC (Bendix) have filed separate motions to exclude the testimony of Dr. Kenneth Laughery (Doc. 133; Doc. 145). Each defendant filed a notice of joinder with respect to the other defendant's motion (Doc. 147; Doc. 159), Plaintiff Sandra Jauregui filed a combined response (Doc. 160), and Defendants filed separate replies (Doc. 169; Doc. 171). Second, Plaintiff has filed a motion to exclude the testimony of Dr. David Cades (Doc. 135), to which Defendants filed a joint response (Doc. 162) and Plaintiff filed a reply (Doc. 174). The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court grants in part and denies in part Defendants' motions and denies Plaintiff's motion.

**I.     Brief Factual Background**

This case arises out of a tragic highway collision in which Plaintiff's late husband, Mr. Jauregui, drove a big-rig truck into another big-rig truck that had stalled and come to

a complete standstill on the Interstate 17. Mr. Jauregui, who perished in the accident, was driving a 2022 Peterbilt Conventional 579 tractor-trailer manufactured by Paccar. Mr. Jauregui's truck was equipped with a product manufactured by Bendix known as the Wingman Fusion, which is an Advanced Driver Assistance System (ADAS) designed to assist drivers with the avoidance of roadway hazards, including stationary objects present in traffic lanes. Plaintiff asserts that a defect in Bendix's collision avoidance system, and/or a defect in the Peterbilt truck's integration of Bendix's technology, proximately caused the collision that killed Mr. Jauregui.

Plaintiff retained Dr. Kenneth Laughery to provide expert testimony on the human factors that contributed to the fatal collision in this case. Dr. Laughery's report addresses whether and why Mr. Jauregui might have been distracted, as well as the efficacy with which Mr. Jauregui would have been able to brake and/or shift lanes if Bendix's ADAS system had issued a driver alert at various intervals preceding the crash. Dr. Laughery's report also opines on the extent to which the prevalence of false alerts affects a driver's willingness to embrace collision-avoidance technology. Defendants argue that Dr. Laughery's expert opinion should be excluded for failure to meet the reliability standard imposed by Federal Rule of Evidence 702.

Defendants retained Dr. David Cades to provide competing human-factors expert testimony. Dr. Cades's report asserts that, in the moments immediately preceding the crash, Mr. Jauregui was driving inattentively and was distracted not by external factors but instead by internal factors, such as his emotional state and his participation in a phone conversation. Dr. Cades also opines that the collision would still have occurred even if Bendix's ADAS system had issued a driver alert to Mr. Jauregui in the seconds before the crash. Plaintiff argues that Dr. Cades ignores certain material facts and that his opinion is therefore inadmissible. The Court addresses the parties' arguments in turn.

**II.    Legal Standard**

Under Rule 702, an expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence,"

provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). The trial judge acts as the "gatekeeper" of expert witness testimony by engaging in a two-part analysis. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592 (1993). First, the trial judge must determine that the proposed expert witness testimony is based on scientific, technical, or other specialized knowledge. *Id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Second, the trial court must ensure that the proposed testimony is relevant—that it "will assist the trier of fact to understand or determine a fact in issue." *Id.* "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401.

"The inquiry envisioned by Rule 702" is "a flexible one." *Daubert*, 509 U.S. at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* The advisory committee notes on the 2000 amendments to Rule 702 explain that Rule 702 (as amended in response to *Daubert*) "is not intended to provide an excuse for an automatic challenge to the testimony of every expert." *See Kumho Tire*, 526 U.S. at 152. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595 (citation omitted).

**III. Discussion**

    **A. Defendants' *Daubert* Motion**

Defendants' first argument against the reliability of Dr. Laughery's expert testimony is their assertion that he impermissibly relied on data from studies that examined "sudden-onset hazards: situations where a driver is suddenly presented with a need to make last-second braking judgments and maneuvers to avoid collision." (Doc. 133 at 9–10 (internal quotation marks omitted).) Defendants assert that it was unscientific for Dr. Laughery to use such data, as the collision at issue here involved a stalled truck that Mr. Jauregui could have perceived "nearly half a minute" prior to impact. Defendants are

wrong. First, as a matter of common sense, one can generally assume that a person who fatally barrels into a stalled vehicle did not perceive the vehicle until it was too late. Suicides do occur, but there is no evidence that Mr. Jauregui's death was a suicide, and neither party has raised that potentiality as even the slimmest possibility. Second, independent evidence indicates that Mr. Jauregui did not perceive the stalled vehicle until just two seconds before he collided with it. (Doc. 133-1 at 3.) Mr. Jauregui was talking on the phone with Mr. Peterson for the ten minutes preceding the crash. (Doc. 133-1 at 3.) Immediately before the crash, Mr. Peterson heard Mr. Jauregui say, "oh shit," after which Mr. Jauregui slammed on the brakes and unsuccessfully attempted to veer aside. Two seconds later, Mr. Peterson heard the collision. (Doc. 133-1 at 3.) Therefore, from the perspective of Mr. Jauregui, which is the only perspective that matters, the stalled trailer does appear to have been a sudden-onset hazard. Defendants are correct that Mr. Jauregui *could have* perceived the stalled vehicle well before he actually did, had he not been distracted. But that proposition does nothing to render Dr. Laughery's opinion unreliable. Based upon the evidence in this case, Dr. Laughery reasonably concluded that Mr. Jauregui did not perceive the stalled truck until there was so little time within which to avoid it that it constituted a sudden-onset hazard.

Defendants next argue that Dr. Laughery lacked a reasonable basis to conclude that a steering response generally consumes less time than a braking response. (Doc. 133 at 10–11.) To arrive at this conclusion, Dr. Laughery subtracted the time it takes for a driver to move his foot from the accelerator pedal to the brake pedal from the time it takes a driver to initiate a brake response generally. (Doc. 133-1 at 7.) His reasoning for employing that relatively simple methodology is that a driver initiating a lane change would already have his hands on the steering wheel and would therefore not need to expend any time moving his relevant appendage from one location to another before undertaking the evasive maneuver. (Doc. 133-1 at 7.) That rationale, although rudimentary, is not unsound, and Defendants fail to identify any logical error committed by Dr. Laughery. Moreover, Defendants' attempt at impugning Dr. Laughery's conclusion that "a steering response is

faster than a braking response" falls flat, as Defendants' own expert opines that "braking has been found to only take slightly longer than steering on average but not enough to be statistically significant." (*See* Doc. 133 at 10; Doc. 133-5 at 46.) Dr. Laughery's conclusion that a braking response takes 0.27 seconds longer than a steering response is consistent with Defendants' expert's statement that braking responses are "slightly longer" than steering responses. The parties may utilize cross-examination to interrogate their opposing experts regarding the extent to which they disagree about statistical significances, but the Court concludes that Dr. Laughery's methodology is sufficiently reliable to pass muster under Rule 702.[1]

Defendants also attack as unreliable Dr. Laughery's assertion that "Bendix engineers appear to have chosen to design a system that was more likely to fail to alert at critical moments, such as when Mr. Jaurgui was approaching the stopped trailer. According to the scientific research, trust in driver automation builds more quickly when it avoids *accidents*, not when it avoids nuisance alerts." (*See* Doc. 133-1 at 8–9 (emphasis in original).) Dr. Laughery rested his conclusion on two things: first, sworn statements by Defendants' employees indicating that they deliberately designed their algorithm to keep false nuisance alerts at a low level; and second, his review of the scientific literature indicating that "the most important factor to increase a driver's behavioral intention to use vehicle automation was the driver's *trust* that the technology would reduce risk in situations characterized by uncertainty and vulnerability" and that "[e]ase of use issues, such as addressing false alarms, were found to be the least influential in increasing driver acceptance of automation." (Doc. 133-1 at 8–9.) Defendants contend that Dr. Laughery lacks the expertise to arrive at such a conclusion because he is unfamiliar with algorithm design. (Doc. 133 at 11–12; Doc. 145 at 8–9.) This argument fails. Dr. Laughery's

---

[1] Defendants argue in their reply briefing that Dr. Laughery employed an unreliable method when he selected the mean reaction time of 0.67 seconds, as opposed to the median reaction time, modal reaction time, or 95th-percentile reaction time. (Doc. 171 at 6.) Defendants did not raise this argument in their motions, and Plaintiff therefore lacked an opportunity to respond to it. The Court declines to consider the argument further. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

- 5 -

testimony has nothing to do with the nuts and bolts of technical algorithm design. Rather, his testimony addresses human-factors considerations that inform the high-level settings of an ADAS algorithm, including the extent to which human beings are tolerant of nuisance alerts. He possesses the requisite expertise to do so.

In a similar vein, Defendants contend that Dr. Laughery issued an impermissible design opinion with his statement that "[t]his was the very kind of high-risk event that the Bendix Fusion system was designed to mitigate and the situation Stationary Vehicle Braking is always looking for a vehicle stopped in the lane ahead." (*See* Doc. 133 at 16; Doc. 133-1 at 5.) Plaintiff argues that that statement is merely a restatement of Bendix's own literature, which Dr. Laughery offers for the purposes of "put[ting] his other opinions in context." (Doc. 160 at 8.) The Court agrees with Plaintiff's reading of Dr. Laughery's report. Nevertheless, out of an abundance of caution, the Court reiterates that Dr. Laughery may not opine on technical algorithm design. Plaintiff does not contest this point, (*see* Doc. 160 at 8), but Plaintiff must ensure that Dr. Laughery's "context" statements are not presented with such categorical language that they become substantive.

Defendants next criticize Dr. Laughery's representation of the study upon which he relied to reach his nuisance-alert conclusion. Defendant's argument is not entirely accurate. Dr. Laughery wrote that the Zhang study indicated that trust in risk mitigation is the most important factor in technology adoption and that ease of use is the least important factor. (Doc. 133-1 at 9.) Defendants respond that:

> Dr. Laughery also misrepresents the findings of his only source. He criticizes "ease of use" considerations as "running counter to the known scientific research regarding how to positively influence people to use the technology." Yet the study expressly recommends "emphasiz[ing] the simplicity and convenience in operating the vehicles," likely because the authors confirmed perceived ease of use was a "significant contribution" on behavioral intention to use automated vehicles.

(Doc. 133 at 12 (internal citations omitted).) Defendants quote both Dr. Laughery and the Zhang study out of context. First, Dr. Laughery did not criticize ease-of-use considerations in general, but rather issued the more targeted indictment that "Bendix's aversion to false

- 6 -

alarms in the interest of, apparently, increasing user acceptance of the technology was not only scientifically unfounded but ran counter to the known scientific research regarding how to positively influence people to use the technology that might, someday, save them from an automobile accident." (Doc. 133-1 at 9.) Second, the Zhang study did not categorically recommend emphasizing ease-of-use considerations, but instead made the more limited recommendation that policymakers should emphasize the characteristics of vehicle technology most likely to resonate with a given audience.

> When promoting partial automation vehicles or targeting the young population, policymakers are advised to emphasize the simplicity and convenience in operating the vehicles. While promoting full automation vehicles or targeting the older group, ways to reduce perceived risks, such as improving related legislation to guarantee the safety and privacy of AV users, publicizing safety standards, and providing adequate training before using, should be more effective in promoting their AV usage intention.

(Doc. 133-6 at 11.) Dr. Laughery's description of the Zhang paper may leave room for debate, but Defendants' condemnation of Dr. Laughery's report as wholly unsupported by the Zhang paper goes too far. The Court concludes that Dr. Laughery's expert opinion is sufficiently reliable to be admissible under Rule 702. To the extent that his opinion is "shaky," for instance because the Zhang paper examined highly automated vehicular technology whereas Bendix's ADAS system is only somewhat automated, (*see* Doc. 133 at 12), Defendants may test the report's validity through "[v]igorous cross examination." *See Daubert*, 509 U.S. at 595.

Defendants next argue that Dr. Laughery's opinion regarding a potential roadside distraction is unreliable because it is based upon speculation. Dr. Laughery writes that Mr. Fuentes may have distracted Mr. Jauregui by standing on the side of the road and waving a flashlight in the air, as the scientific literature suggests that "human attention can be better captured when visual stimuli are put in motion" and that "flashing roadside lights increases the time it takes a driver to identify a road hazard ahead." (Doc. 133-1 at 7–8.) Thus, Dr. Laughery concludes that if Mr. Jauregui saw the light that Mr. Fuentes was waving, then that may explain Mr. Jauregui's delayed response to the stalled vehicle.

- 7 -

(Doc. 133-1 at 8.) Defendants attack this conclusion because, contrary to Dr. Laughery's initial assumption that Mr. Fuentes was waving a powerful light, the evidence indicates that he was instead waving a cellphone flashlight. (Doc. 133 at 13.) Dr. Laughery concedes that he would have been "very hesitant" to conclude that a cellphone flashlight on the side of the road could have distracted a driver approaching a stalled vehicle. (Doc. 133-2 at 44–45.) Plaintiff responds that "while Dr. Laughery conceded that a cell phone light might not have had the same impact as a brighter flashlight, he did not concede that it would not have been distracting, just potentially less so." (Doc. 160 at 13–14.) The Court agrees with Plaintiff. Although Dr. Laughery's opinion is certainly weakened by the revelation that Mr. Fuentes was likely only waving a cellphone flashlight, the Court cannot say that that fact renders the expert report unreliable. A man who is "very hesitant" to reach a conclusion may still do so. Once again, this issue is better resolved through vigorous cross-examination than through a *Daubert* motion.

To the extent that Defendants object to Dr. Laughery's opinion because "he does not know what Jauregui was looking at when the collision occurred," Defendants have failed to understand the purpose of Dr. Laughery's report. (*See* Doc. 145 at 10–11.) He is attempting to explain Mr. Jauregui's distraction, which is the same thing that Dr. Cades does in his own expert report, discussed in greater detail *infra*. The fact that Dr. Laughery is honest in stating that Mr. Fuentes's flashlight constitutes a likely source of distraction, as opposed to an irrefutable source of distraction, makes his report more credible in the eyes of the Court, not less. Although it may be the case that Mr. Jauregui was distracted for an entirely different reason, the Court perceives no reliability issue with Dr. Laughery's qualified conclusion.

Despite the various unavailing arguments described above, Defendants do succeed in establishing the inadmissibility of one portion of Dr. Laughery's opinion. After descrbing Bendix's operating manual for its Wingman Fusion ADAS system, which states that drivers can generally expect to experience a warning or automatic breaking in circumstances similar to those of the crash, Dr. Laughery writes that "[d]river's [sic]

reviewing these materials would reasonably have been led to believe that the Fusion system was going to be 'most useful' when dealing with a stalled vehicle at night" and that, "[a]s such, Mr. Jauregui would have reasonably assumed that he would have received a forward collision warning accompanied by automatic emergency braking when driving on I-17 at the time the accident occurred." (Doc. 133-1 at 5–6.) Dr. Laughery concludes that "[h]e should have been warned that, in this not-so-rare of circumstances, the Fusion system was probably going to be of little or no help." (Doc. 133-1 at 5.) Defendants attack those statements on several grounds. First, Defendants assert that this portion of Dr. Laughery's opinion is irrelevant because there is no evidence that Mr. Jauregui or any other driver ever read the manual or relied on the statements made therein, and also because Plaintiff has not brought a failure-to-warn claim. (Doc. 133 at 14–15; Doc. 145 at 9, 11.) Second, Defendants contend that Dr. Laughery's conclusion is unreliable because he himself admits that he "never saw anything either affirming that [the drivers] loved these [ADAS] systems and that they rely on them." (*See* Doc. 133-2 at 114.) Thus, Defendants argue that his conclusion regarding what Mr. Jauregui did or did not believe is not based on any facts or methodology. (Doc. 133 at 15–16.)

The Court agrees with Defendants. Dr. Laughery's opinion that Mr. Jauregui relied on Bendix's operating manual and other promotional materials does not appear to be predicated on any scientific expertise, but instead boils down to the lay assertion that a product user might read the product's manual and believe the contents thereof. Absent some substantiating data or scientific principles, that assertion is not admissible expert testimony. Moreover, Plaintiff did not respond to Defendants' arguments regarding Dr. Laughery's statements about Bendix's manual. (*See* Doc. 160; Doc. 171 at 12.) The Court therefore deems this issue conceded. *See Brown v. Sperber-Porter*, No. CV-16-02801-PHX-SRB, 2017 WL 10410091, at *4 (D. Ariz. Dec. 20, 2017) (noting that "a court may consider an argument conceded when a party fails to counter it").

Finally, Defendants argue that Dr. Laughery ought to be prevented from offering legal conclusions, such as his statement that "Bendix had a duty to appropriately warn their

1  users of this risk and its potential consequences." (*See* Doc. 133 at 17; Doc. 133-1 at 6.)
2  Plaintiff does not argue that such statements are admissible, but instead simply states that
3  "[d]uring Dr. Laughery's testimony in this matter, Plaintiff will ensure that, while he will
4  be asked appropriate questions about the ultimate issues in this case, none of the questions
5  will be designed to elicit a legal conclusion." (Doc. 160 at 15–16.) There is thus no dispute
6  regarding this issue for the Court to resolve at this juncture.

### B. Plaintiff's *Daubert* Motion

Although Plaintiff does not expressly couch her *Daubert* motion as a reliability challenge, that is effectively what it is. (*See* Doc. 174 at 1.) The crux of Plaintiff's motion is her assertion that Dr. Cades impermissibly disregarded material evidence in arriving at his conclusion that Mr. Jauregui was driving inattentively in the moments leading up to the collision. In order to understand the parties' dispute, one must first understand the nuances of certain terminology utilized by Dr. Cades in his report.

Dr. Cades discusses both "inattention" and "distraction," and his report makes clear that the two terms are not synonymous. Inattention is simply one of many possible sources of distraction. "Distractions can be visual (i.e., looking at anything other than the road ahead), manual (i.e., taking one or both hands off the wheel for any reason), and/or cognitive (i.e., when the driver's mind is not focused on driving) in nature." (Doc. 135-2 at 47.) "In some instances, drivers may have no direct reason for their distraction and can cause collisions by simple inattention or 'daydreaming.'" (Doc. 135-2 at 47.) Thus, a distraction may be something exogenous to the driver, such as intrusive visual or auditory stimuli originating outside the vehicle, or a distraction may be something endogenous to the driver, such as inattention or the decision to send a text message. According to Dr. Cades, skilled drivers mitigate the effects of exterior distractions by "restrict[ing] their attention to monitor only the most critical inputs." (Doc. 135-2 at 47.)

Here, there is no dispute that Mr. Jauregui was a distracted driver in the instant before the accident. (*See* Doc. 135 at 3.) The parties' disagreement concerns what caused Mr. Jauregui to be distracted. Dr. Cades asserts that Mr. Jauregui was inattentively

- 10 -

distracted because he was "on the phone with Mr. Peterson and was 'venting' after having gotten 'into a fight' with a Shamrock supervisor prior to the incident." (Doc. 135-2 at 59; *see also* Doc. 135-2 at 57 ("If [Mr. Jauregui] had been an alert and attentive driver, any emergency response in the final seconds prior to collision would have been unnecessary.").) In contrast, Plaintiff asserts that the "clear sources of distraction" were two visual stimuli on the side of the road in the vicinity of the stalled trailer, namely (1) a flashlight being waved by Mr. Fuentes and (2) "a crash scene trailer mounted mobile 'variable message board.'" (Doc. 135 at 3.)

Plaintiff first attacks Dr. Cades's opinion as not being "supported by anything in the factual record." (Doc. 135 at 3, 6, 10.) This argument fails, as Dr. Cades's report is well-substantiated by both facts and scientific methodology.

> From this analysis, had [Mr. Jauregui] been alert and attentive, with his foreknowledge of the presence of a stalled vehicle in the roadway combined with the numerous visual cues present he would have been able to avoid this crash without needed [sic] an emergency response. However, at the time of the incident [Mr. Jauregui] was on the phone with Mr. Peterson and was "venting" after having gotten "into a fight" with a Shamrock supervisor prior to the incident. Research has demonstrated that using a cell phone while driving can divert attention away from processing the information needed to drive, can induce a form of inattentional blindness and failure to notice and/or respond to a hazard, can increase reaction time (including the time a driver needs to initiate braking), and can increase the likelihood of being involved in a rear-end collision. While [Mr. Jauregui] was using a hands-free cellular device at the time, research has consistently demonstrated that there are no differences in the effects of the cognitive distraction on driving when using a hand-held as compared to hands-free device. Furthermore, research has additionally shown that drivers in an angry emotional state tend to ruminate on the emotional context and subsequently exhibit higher rates of inattentional blindness and decreased situational awareness. In sum, [Mr. Jauregui's] collision with Mr. Vizcarra's vehicle is consistent with the attentional lapses, distraction, and inattentive state associated with driving while emotional and distracted by cell phone use.

(Doc. 135-2 at 59 (footnotes omitted).) Plaintiff cites two cases from sister districts in which federal courts held that certain experts did "not explain in any way how he formed the opinion Morgan should have seen the pickup truck slowing in front of him" and

1   "offer[ed] no real insight as to what caused the vehicle and trailer to take those paths."
2   (Doc. 135 at 10–11 (citing *Stiefel v. Malone*, No. 4:18-CV-01540-SGC, 2021 WL 426217,
3   at *10 (N.D. Ala. Feb. 8, 2021) and *Strong v. U-Haul Co. of Mass.*, No. 1:03-CV-00383,
4   2006 WL 5164822, at *9 (S.D. Ohio Dec. 28, 2006)).) Those cases are inapposite, as
5   Dr. Cades does explain the basis of his opinion here.

> To further assess whether [Mr. Jauregui] had the visual information necessary to avoid the incident, I analyzed the extent to which [Mr. Jauregui] could have appreciated the looming cue alone to successfully initiate an avoidance maneuver. As discussed, research on driver response shows that the rate at which the relative size of a lead vehicle grows is used by drivers as an indication of whether or not an object they are approaching is stopped or slow moving and may pose a hazard. The earliest point at which a viewer can use this cue to make accurate speed and distance judgments is called the looming threshold. Based on the looming cue alone, an alert and attentive driver in [Mr. Jauregui's] position traveling 62 to 69 mph would be able to detect a vehicle in the position of Mr. Vizcarra's stalled tractor trailer as stopped from approximately 361 to 539 feet. This suggests that an alert and attentive driver in [Mr. Jauregui's] position would have had sufficient visual information from the looming cue alone to detect Mr. Vizcarra's vehicle well in advance of impact. Importantly, this analysis solely takes into account the looming cue, and does not consider other available information—such as other visual information (e.g., illuminated hazard lights, flashlight) or [Mr. Jauregui's] foreknowledge and expectancy of the stalled vehicle in the roadway—and demonstrates that this incident was avoidable. Furthermore, as previously stated and consistent with this approximately 250 other vehicles (approximately 40 of which were trucks) passed by and successfully avoided Mr. Vizcarra's stalled vehicle.

(Doc. 135-2 at 58–59 (footnotes omitted).)

Plaintiff's second argument is that Dr. Cades failed to adequately consider the distracting effect of Mr. Fuentes's flashlight and the mobile message board. (Doc. 135 at 3–5 ("Dr. Cades did not evaluate in his report how the Fuentes flashlight waving and/or the crash scene variable message board presence would have occupied Jose's attention or the time those two factors probably occupied Jose's attention.").) That assertion is untrue insofar as it relates to Mr. Fuentes's flashlight. Dr. Cades's report expressly contemplates and rejects the flashlight as a source of distraction, opining that "if [Mr. Jauregui] was

- 12 -

1  indeed confused or unable to determine what was ahead of him in the roadway, it would
2  have been appropriate to reduce his speed at that point to afford him more time to identify
3  and understand what was ahead" and that "there is no scientific reason to believe that
4  Mr. Fuentes' moving flashlight pointed at the ground affected [Mr. Jauregui's] ability to
5  perceive and react to the stalled truck's flashing lights." (Doc. 135-2 at 62–63.) Although
6  Plaintiff may disagree with that conclusion, the Court's focus is not on the correctness of
7  an expert's ultimate determinations, but is instead focused on whether the expert employed
8  a reliable methodology.

Plaintiff's argument also fails with respect to the mobile message board. Plaintiff is correct that Dr. Cades's report does not consider the human-factor consequences of the mobile message board, but that is unsurprising given that Dr. Cades was not aware of that message board's existence at the time he issued his report. Although Dr. Cades analyzed a different message board, he indicated during a deposition that he was not previously aware of the presence of a second message board much closer to the scene of the accident. (*See* Doc. 135-1 at 206–10.) Nevertheless, upon being shown the location and nature of this second mobile message board, Dr. Cades affirmed that it "does not change anything about [his] analysis." (Doc. 135-1 at 210.) That assertion is based upon Dr. Cades's determination that an alert and attentive driver would have avoided the stalled trailer even if he had perceived both a waving flashlight and a mobile message board. (*See* Doc. 135-1 at 202–03 ("So looking at the totality of that, what I would expect from a human factors perspective an alert and attentive driver to do is to prioritize the most relevant stimuli and the most relevant information to optimize the likelihood of a safe outcome. So in looking at everything, an alert and attentive driver would certainly understand and appreciate a stopped trailer in his lane of travel.").) Plaintiff characterizes that conclusion as a "refus[al]" to consider evidence, and that such refusal is so unreasonable as to be indicative of "bias." (*See* Doc. 135 at 4, 9–10.)

The Court rejects Plaintiff's unreliability argument regarding the mobile message board for two reasons. First, Dr. Cades's statements in his deposition, although frustrating

to Plaintiff's position, do not indicate an unreliable methodology. The parties and their respective experts debate how much time an attentive driver would devote to reading a roadside sign and what ancillary actions such a driver would engage in while looking away from the road, but neither party's reasoning is unreliable or otherwise faulty. Dr. Cades's determination that the mobile message board is inconsequential to his ultimate conclusions ought to be vetted via cross-examination, not a motion to exclude. Even if Dr. Cades's refusal to alter his assessment in light of the mobile message board is unreasonable, the Court would hesitate to so conclude on the basis of deposition testimony. Ironically, Dr. Cades's belatedly learning of the mobile message board mirrors Dr. Laughery's belatedly learning that Mr. Fuentes was likely not waving as strong a light as previously thought. The Court holds that the proper means by which to undermine both experts' conclusions is cross-examination, not exclusion. Second, it is somewhat incongruous for Plaintiff to argue that Dr. Cades's expert testimony is categorically inadmissible based upon his failure to attribute Mr. Jauregui's distraction to the mobile message board, as Dr. Laughery did not do so himself. Indeed, Dr. Laughery's report does not even mention the mobile message board. Instead, Dr. Laughery asserts that, if Mr. Jauregui saw Mr. Fuentes's flashlight, which Plaintiff vociferously contends that he did, then the flashlight "more likely than not explain[ed] his late observation of and response to the stalled vehicle." (*See* Doc. 133-1 at 8.) According to Plaintiff's reasoning, Dr. Laughery's conclusion must be illogical, as it failed to consider an additional potential source of distraction. The Court rejects that outcome. It is appropriate for the jury to hear from both experts, after which the jury can make a finding of fact, as is its province.

Plaintiff also argues that Mr. Jauregui could not possibly have been inattentive at the time of the crash due to emotional dysregulation and/or a phone conversation, as the evidence tends to indicate that he was driving attentively ten minutes prior to the crash while in the same emotional state and on the phone. (*See* Doc. 135 at 2–3, 9, 12.) This contention misses the mark. It does not follow from logic, law, or science that the circumstances giving rise to inattention at one moment must also give rise to identical

inattention at all other moments during which such circumstances exist. For instance, a driver who distractedly causes a car accident because he was texting may well have texted numerous times in the past without causing car accidents. The Court leaves to the jury the probabilistic weighing of tendency evidence.

Plaintiff's final argument is that Dr. Cades proffered no basis in support of his opinion that "[i]n the event that a [forward collision warning] had been issued, there is insufficient evidence to conclude that [Mr. Jauregui] would have reacted to the warning and avoided this incident." (*See* Doc. 135 at 13; Doc. 135-2 at 68.) Again, Plaintiff's argument improperly addresses her disagreement with Dr. Cades's conclusion, not whether his opinion lacked a sound methodology. Dr. Cades clearly explained how he arrived at his determination that a forward collision warning (FCW) may not have made a difference in this case.

> Specifically, published [perception-response time (PRT)] to an audio and visual FCW for a cognitively distracted driver can range from 0.5 to 4.1 seconds, and shows that drivers sometimes fail to respond in time to a collision even when a FCW [sic] is provided. Even in the data relied upon by Dr. Laughery, response times included values from 1.4 to as high as 2.0 seconds as well as data from individuals who did not respond at all. And generally, studies on PRT to FCW—including those cited by Dr. Laughery—largely fail to tease apart whether drivers were responding to the obstacle present or to the FCW, and thus it is unclear to what extent drivers in these studies relied on the FCW to avoid the hazard or began initiating a response prior to the FCW activating.

(Doc. 135-2 at 65 (footnotes omitted).) The Court concludes that Dr. Cades's expert testimony is admissible.[2]

. . .

. . .

---

[2] Plaintiff argues in her reply brief that Dr. Cades impermissibly relied on the eyewitness testimony of Mr. Fuentes regarding his ability to perceive the stalled truck a half mile prior to encountering it. (Doc. 174 at 5–7.) First, the Court does not understand this argument, as Plaintiff is simply not correct in describing this testimony as a "cornerstone" of Dr. Cades's report. (*See* Doc. 174 at 6.) Second, to the extent this argument has merit, Plaintiff waived it by not raising it in her motion. *See Zamani*, 491 F.3d at 997 ("The district court need not consider arguments raised for the first time in a reply brief.").

**IV.  Conclusion**

Dr. Cades's expert opinion is admissible. The majority of Dr. Laughery's expert opinion is also admissible. However, Dr. Laughery's opinion that Mr. Jauregui read Bendix's literature and relied thereon is inadmissible.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendants' motions to exclude the expert testimony of Dr. Kenneth Laughery (Doc. 133; Doc. 145).

**IT IS FURTHER ORDERED** denying Plaintiff's motion to exclude the testimony of Dr. David Cades (Doc. 135).

Dated this 25th day of March, 2025.

Honorable John J. Tuchi
United States District Judge