**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sandra Jauregui, | No. CV-23-00729-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Daimler Truck North America LLC, *et al.*, | |
| Defendants. | |

Three motions for summary judgment are at issue. Defendants PACCAR Incorporated (Paccar) and Bendix Commercial Vehicle Systems LLC (Bendix) have each filed a motion for summary judgment (Doc. 137; Doc. 142), and each defendant has filed a notice of joinder with respect to the other defendant's motion (Doc. 149; Doc. 159). Plaintiff filed separate responses (Doc. 183; Doc. 187), and Defendants filed separate replies (Doc. 195; Doc. 197). Plaintiff has also filed a motion for partial summary judgment (Doc. 139), to which Defendants filed separate responses (Doc. 181; Doc. 185) and Plaintiff filed a combined reply (Doc. 196). The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court awards summary judgment in Defendants' favor.

**I.  Background**

This case arises out of a tragic trucking accident involving Plaintiff's late husband, Jose Jauregui. Unless otherwise noted, the following facts are undisputed. On May 22, 2022, several drivers for Shamrock Farms were heading north on the I-17 in big-rig trucks

1  laden with cargo. One such driver was Ramon Vizcarra. For unknown reasons, his truck
2  spontaneously lost motive power, stalled, slowed down, and eventually came to a complete
3  standstill in an active traffic lane in the middle of the highway. Mr. Vizcarra turned on his
4  hazard lights and exited his vehicle. Hundreds of drivers saw Mr. Vizcarra's stalled truck
5  and safely avoided it. Among the many drivers who navigated around Mr. Vizcarra's
6  vehicle was Gabriel Fuentes, who was also a Shamrock Farms truck operator. Upon
7  perceiving Mr. Vizcarra's truck sitting idle in the center of the road, Mr. Fuentes navigated
8  his own truck to the highway's shoulder, whereupon he exited his vehicle and began
9  waving a flashlight in the air in an effort to alert other drivers to the danger posed by
10 Mr. Vizcarra's stalled truck.

11       Mr. Jauregui was also driving a Shamrock Farms big-rig truck northbound on the
12 I-17 on the morning of May 22, 2022. While on the road, he called his colleague Chase
13 Peterson using a hands-free cellular device, and the two men conversed about
14 Mr. Jauregui's frustration regarding certain aspects of his job. On that phone call,
15 Mr. Jauregui informed Mr. Peterson of his contemporaneous observation of a highway
16 digital message board informing drivers that there was a stalled vehicle ahead.
17 Unfortunately, despite receiving that warning, Mr. Jauregui did not perceive Mr. Vizcarra's
18 truck until it was too late, and he slammed into it at over sixty miles per hour while still on
19 the phone with Mr. Peterson. Mr. Jauregui died upon impact. Immediately prior to the
20 collision, Mr. Peterson heard Mr. Jauregui say the words "oh shit," followed shortly
21 thereafter by the sounds of the crash. The tire marks left on the road by Mr. Jauregui's truck
22 indicate that, at the last second, he applied the brakes and unsuccessfully attempted to veer
23 around Mr. Vizcarra's stalled vehicle. The parties dispute why Mr. Jauregui failed to
24 adequately detect and navigate around Mr. Vizcarra's stalled truck. Defendants assert that
25 Mr. Jauregui was distracted because he was engaged in a conversation, emotionally
26 impassioned, and generally inattentive. Plaintiff asserts that he was distracted by
27 Mr. Fuentes's moving flashlight and by a blinking digital sign on the side of the road near
28 the stalled vehicle.

Mr. Jauregui's truck, which was designed and manufactured by Paccar, was equipped with an advanced driver assistance system (ADAS) known as the Wingman Fusion, which was designed and manufactured by Bendix. The crux of this case relates to the functionality of the Wingman Fusion ADAS system, both in general and during the specific accident involving Mr. Jauregui's truck. The Wingman Fusion system is designed to assist drivers in the avoidance of roadway danger by, *inter alia*, issuing audible warnings when a collision is imminent and automatically applying the brakes when the driver does not do so himself. Bendix's system generates data from camera and radar sensors, from which it then determines whether objects in the vicinity of the host vehicle constitute a risk, such as the risk posed by a stationary vehicle. The camera and radar sensors operate at different acuity levels in different physical conditions, and as a result the sensors generate a confidence determination that accompanies the sensors' identification of the host vehicle's surroundings. This data is then fed into Bendix's algorithm, which decides whether to initiate an alert and/or automatic braking. The algorithm only triggers a collision-avoidance response if the system's sensors definitively detect a hazard, as the algorithm is designed to balance the competing goals of responding to potential risks and avoiding false alerts. Although the parties do not dispute the foregoing high-level description of the Wingman Fusion, the parties disagree on the finer points of the system's functionality, including the precise extent to which the sensors are capable of perceiving a stalled vehicle in the conditions of the collision at issue here, as well as the exact degree to which the system's algorithm balances the contrasting objectives of avoiding false alerts and avoiding collisions.

A threshold question of fact in this case is whether the Wingman Fusion system installed on Mr. Jauregui's truck did or did not undertake a collision-avoidance action. Mr. Peterson, who is familiar with the sound of a driver alert and who was on the phone with Mr. Jauregui at all points relevant to the accident, reports that he did not hear the issuance of a driver alert. However, because Mr. Jauregui's vehicle and all of its onboard data were destroyed in the fire after the collision, there is no hard evidence that an alert

- 3 -

was or was not issued. Similarly, there is no direct evidence that the Wingman Fusion did or did not initiate automatic braking. Defendants assert in a roundabout manner that the system did in fact issue an alert and/or automatically brake the vehicle, but they do not meaningfully develop this point. (*See* Doc. 137 at 12; Doc. 142 at 3.) Defendants' proposition is dubious, as the tire marks indicate contemporaneous braking *and* steering, (*see* Doc. 142 at 3), and Defendants explain that "[t]he Bendix System does not provide steering assistance under any circumstances," (*see* Doc. 137 at 13). In any event, as Plaintiff is the nonmovant on this point, the Court will assume at this juncture that the Wingman Fusion system did not activate. The primary question in this case is *why* the Wingman Fusion did not activate. The Court will address that issue in detail below.

In this wrongful death suit, Plaintiff brings negligence claims and strict liability claims for both design defects and manufacturing defects, (*see* Doc. 1 at 12–16.), but the parties devote nearly all of their briefing to Plaintiff's design defect claims. The Court will address Plaintiff's motion for partial summary judgment first, as it concerns an initial question of law.

## II.   Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

**III.   Discussion**

    **A.   Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves the Court to enter partial summary judgment on a sub-issue of its strict liability design defect claims, namely whether the Wingman Fusion system failed to perform in accordance with reasonable consumer expectations. That assertion presupposes that the consumer expectation test is applicable to those claims. Defendants contend (1) that the consumer expectation test does not apply and (2) that summary judgment is inappropriate in any event, regardless of which design defect test the Court employs.

. . .

1  "Although the doctrine of strict liability in tort imposes liability without proof of negligence, the law does not impose liability for every injury caused by a product. Liability exists only if the product was in a 'defective condition unreasonably dangerous.'" *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 244 (1985) (quoting Restatement (Second) of Torts § 402A (1965)). In order to establish a *prima facie* case of strict product liability, Plaintiff must demonstrate "that the product was in a defective condition that made it unreasonably dangerous, that the defective condition existed when the product left the defendant's control, and that the defective condition proximately caused the plaintiff's injuries." *Dillon v. Zeneca Corp.*, 202 Ariz. 167, 172 ¶ 14 (Ct. App. 2002). A product may be unreasonably dangerous via one of three ways: "a manufacturing defect, a design defect, or an informational defect encompassing its instructions and warnings." *Id.* Here, Plaintiff alleges both a manufacturing defect and a design defect, but not an informational defect. Manufacturing defects and design defects are frequently analyzed according to two different tests, namely the consumer expectation test and the risk/benefit test. *See Golonka v. Gen. Motors Corp.*, 204 Ariz. 575, 581 ¶ 13 (Ct. App. 2003). The main difference between the two tests is the relative role played by consumer expectations, which tend to be more well-formed in manufacturing defect cases, in which consumers regularly have experience using non-defective versions of the same product, than in design defect cases, in which consumers often lack an understanding of how safe the product could have been under alternative designs. *Id.* ¶¶ 14–15. "Consequently, when application of the consumer expectation test is unfeasible or uncertain in design defect cases, courts additionally or alternatively employ the risk/benefit analysis to determine whether a design is defective and unreasonably dangerous." *Id.* ¶ 15.

When a plaintiff brings suit alleging "both a manufacturing defect and a design defect, and the evidence indicates that the [consumer] had no expectation with respect to the design of the product," then the court must bifurcate its analysis and apply different tests to the two claims, namely "the consumer expectation [test] on the manufacturing defect claim and a risk/benefit [test] on the design defect claim." *See Boy v. I.T.T. Grinnell*

*Corp.*, 150 Ariz. 526, 536 (Ct. App. 1986). There appears to be no disagreement that the consumer expectation test applies to Plaintiff's manufacturing defect claims. The parties' dispute concerns which test governs Plaintiff's design defect claims.

In Arizona, the prerequisite to application of the consumer expectation test in a design defect case is a finding that the "ordinary consumer" of the relevant product has coherent expectations regarding the design of that product. *See Golonka*, 204 Ariz. at 581 ¶ 14 (quoting *Dart*, 147 Ariz. at 245). The consumer of a product is the user of the product, not the purchaser thereof. S*ee, e.g.*, *Boy*, 150 Ariz. at 527–28 (holding that an apprentice pipe installer was the "consumer" of a piece of pipe that he was installing but did not purchase). Thus, the consumer here is an ordinary trucker. Although many Arizona cases speak of the expectations of "the" consumer, *see Boy*, 150 Ariz. at 536, the Court interprets such verbiage as referring to the platonic or royal consumer, so to speak, not the particular consumer involved in a given lawsuit. In its seminal case on design defect jurisprudence, the Arizona Supreme Court formulated the consumer expectation test as an inquiry into whether "the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonable manner." *Dart*, 147 Ariz. at 245. Moreover, regardless of whether Arizona courts refer to "the consumer" or "an ordinary consumer," the analyses employed by the courts of this state hinge upon whether the relevant *class* of consumers holds coherent design expectations, not whether the specific party involved in the litigation holds such expectations. *See, e.g.*, *Brethauer v. Gen. Motors Corp.*, 221 Ariz. 192, 199 ¶¶ 26–28 (Ct. App. 2009). Here, the distinction between a specific consumer and an ordinary consumer is largely academic because Plaintiff fails to show that any relevant consumer of ADAS technology possesses reasonably well-formed expectations of the product's design. Indeed, Plaintiff does not even meaningfully attempt to do so.

Her motion rests solely upon assertions about "what a consumer *should* expect from the Bendix Wingman Fusion system," not what a consumer actually *does* expect. (See Doc. 139 at 7 (emphasis added).) The evidence cited by Plaintiff consists primarily of statements made by Bendix concerning the capabilities of the Wingman Fusion system.

For instance, Plaintiff cites to the operator's manual, which states "[w]hen a potential collision with a large, stationary, metallic object in your lane of travel (definitively identified as a vehicle) is detected, the system can sound an alert up to 3.5 seconds before impact." (*See* Doc. 139 at 2–3.) Plaintiff also cites deposition testimony from Bendix personnel "confirm[ing] that if the Fusion system for model year 2022 is able to identify a vehicle as a vehicle that is stopped in the lane ahead of the host vehicle, then the system will provide a forward collision alert for the host vehicle if the host vehicle is traveling at least 15 mph." (*See* Doc. 139 at 3.) Plaintiff also adduces evidence that Shamrock Farms relied on the statements in Bendix's marketing materials when it made the decision to purchase vehicles equipped with collision-avoidance technology. (*See* Doc. 139 at 4–5.) Finally, Plaintiff proffers evidence that the federal government has encouraged truck manufacturers to educate the public about the benefits of ADAS technology. (See Doc. 196 at 6.) Conspicuously absent from Plaintiff's briefing is any evidence that ordinary truck drivers have internalized Bendix's promotional literature or otherwise formed expectations regarding the design of ADAS systems.[1] Plaintiff's position therefore reduces to the

---

[1] The only sentence in Plaintiff's motion addressing the expectations of ordinary consumers is the following: "Further, Chase Peterson's immediate thought upon hearing the crash without hearing a Forward Collision Warning alert is strong evidence of what a user/driver of a 2022 Peterbilt with Wingman Fusion on it expects from that Wingman Fusion system." (*See* Motion at 7.) The Court agrees that that statement is probative, but it is completely unsupported by the record. In discussing Mr. Peterson's familiarity with Bendix driver alerts and his ability to perceive such alerts through the medium of a cell phone conversation, Plaintiff substantiates her factual contentions with citations to her separate statement of facts. (*See* Motion at 5–6.) Notably, however, the quoted statement above is not supported by any citation to the record. Moreover, upon independently reviewing Plaintiff's separate statement of facts, the Court is unable to perceive the basis of the assertion. Therefore, the Court must reject Plaintiff's argument that Mr. Peterson's immediate impression of surprise at not hearing an alert constitutes evidence of ordinary consumer expectations. *See* LRCiv 56.1(e) ("Memoranda of law filed in support of or in opposition to a motion for summary judgment, including reply memoranda, must include citations to the specific paragraph in the statement of facts that supports assertions made in the memoranda regarding any material fact on which the party relies in support of or in opposition to the motion."). Defendants do identify some testimony that is probative of the expectations of Shamrock drivers. For instance, Mr. Peterson appears to be familiar with the functioning of the Wingman Fusion system, (*see* Doc. 182-1 Ex. 9 at 14–17), but Mr. Fuentes appears to be unfamiliar with such technology, *see* (Doc. 182-1 Ex. 8 at 32–34 ("**Q.** Are you familiar with like systems on a tractor that will help assist a driver? **A.** Yes. Yes, these new tractors, they've got so many sensors and . . . **Q.** Do you know anything about those systems? **A.** I really don't, honestly.")). It is not the Court's role to sift through the record identifying evidence that might favorably bear upon Plaintiff's motion but that Plaintiff did not see fit to present to the Court. That is why the Court adopted Local

proposition that product designers automatically inculcate design expectations in their consumers whenever they publish materials describing the design of their product. In other words, the logical conclusion of Plaintiff's argument is that any product for which there is a manual, commercial, or sales pitch is *ipso facto* subject to the consumer expectation test in a design defect lawsuit.

Although Plaintiff cites several cases indicating that in California "the consumer expectation theory . . . would seem necessarily to encompass a case in which it is alleged the product failed to perform in accordance with the representations contained in its own owner's manual," (*see* Doc. 196 at 8), that is not the law in Arizona. There is not a single Arizona case, reported or unreported, holding that ordinary consumer expectations are determined by the words in an operating manual. As neither party cites to any Arizona case addressing that proposition, and as the Court has not independently identified any such case, it is impossible to say definitively that the Arizona judiciary would reject Plaintiff's position. Nevertheless, the Court is satisfied that operating manuals are not dispositive of consumer expectations in Arizona. In a case somewhat analogous to the instant matter, the Arizona Court of Appeals held that the consumer expectation test applies to the design of automobile seatbelts. *See Brethauer*, 221 Ariz. at 200 ¶ 28. The court did not rest its holding upon any statements made in operating manuals or other promotional literature published by the seatbelt's designer, but instead upon the fact that "our society is educated from a young age about the importance of 'buckling up' and using seatbelts while driving vehicles." *Id.* In *Golonka*, the Arizona Court of Appeals discussed a product's manual, but only in the context of the plaintiff's failure-to-warn claims, not in relation to the consumer expectation test. *See* 204 Ariz. at 585 ¶¶ 32–33. Neither *Brethauer* nor *Golonka* affirmatively establishes that an operating manual cannot by itself create a consumer expectation. Nevertheless, the absence of any Arizona case so holding is telling. The Court concludes that Bendix's operating manual and related literature do not establish that

---

Rule 56.1. And even if this evidence had been properly argued, it is unclear what effect conflicting expectations of a small handful of a single business's employees would have on the determination of an "ordinary" consumer's expectations.

- 9 -

ordinary consumers of ADAS technology harbor reasonable design expectations, particularly as there is no evidence that the relevant class of consumers ever internalized the contents of the operating manual. Of course, an operating manual is certainly some evidence that is relevant to the consumer expectation inquiry. The Court merely holds herein that, in general, an operating manual (and other similar materials) cannot be the sole basis upon which a plaintiff invokes the consumer expectation test.

In a recently issued memorandum decision, the Arizona Court of Appeals held that the consumer expectation test did not apply to a design defect claim brought against an automobile manufacturer who declined to install lane departure warning (LDW) technology in its vehicles. *Maywald v. Toyota Motor Corp.*, No. 1 CA-CV 23-0723, 2024 WL 5165445, at *2 ¶ 10 (Ariz. Ct. App. Dec. 19, 2024).

> Here, we are unpersuaded that LDW technology is so familiar and ubiquitous to the driving public that the ordinary driver would expect its inclusion as necessary to the safe performance of the vehicle. The Maywalds point to evidence they submitted that LDW has been available in other Toyota models since 2002. And they submitted further evidence concerning studies about LDW's efficacy in preventing accidents due to unintentional lane departures, and its wide availability in 2019, including on most other Toyota model lines. But even viewing it in the light most favorable to the Maywalds, this evidence cannot establish the kind of wide public acceptance and awareness of LDW required to impute a general expectation of its inclusion in vehicles, such that Toyota's failure to include LDW in the design of the 2019 4Runner made it unreasonably dangerous.

*Id.* Although the facts of *Maywald* differ from the facts here, the Court finds that *Maywald* is sufficiently analogous to guide the outcome of the instant dispute. The primary distinguishing feature of the *Maywald* decision is that the "consumer" therein was the general motoring public, not the narrower class of truckers. But, as noted, there is no evidence that truck drivers have embraced ADAS technology to such a degree that they now possess coherent design expectations of such technology to an extent materially greater than the motoring public.

The other distinguishing detail of *Maywald* is that the alleged defect in that case was the wholesale absence of LDW technology, whereas in the instant case Plaintiff alleges

1 that Bendix's system was extant but poorly designed. Again, however, Plaintiff does not
2 explain in her motion how the Court could conclude that truck drivers' exposure to ADAS
3 technology is so extensive that they can now be said to harbor expectations regarding
4 alternative designs thereof. In *Maywald*, the issue was not whether a particular LDW
5 product was defectively designed, but instead whether a vehicle was defectively designed
6 for failing to include LDW technology. Thus, the "product" at issue was an automobile,
7 not the more esoteric and less widely understood LDW device. *See Maywald*, 2024 WL
8 5165445, at *1 ¶ 4. In contrast, the allegedly defective product in the instant case is the
9 ADAS technology itself. The average driver and/or trucker would likely have more robust
10 design expectations regarding automobiles generally than he would regarding LDW and/or
11 ADAS technology specifically. Thus, this case is an even worse candidate for the consumer
12 expectation test than was *Maywald*, which the Arizona Court of Appeals held was itself a
13 poor candidate for the consumer expectation test.

14 Moreover, even if ADAS technology were "familiar and ubiquitous to the [trucking]
15 public," *see Maywald*, 2024 WL 5165445, at *2 ¶ 10, the Court would still hesitate to
16 conclude that truck drivers possess coherent expectations related to the nuances of the
17 technology's design, as opposed to the much coarser expectation that a vehicle simply
18 include some version of such technology. In a published opinion, the Arizona Court of
19 Appeals held that the consumer expectation test governed a claim alleging defective design
20 of automobile seatbelts. *See Brethauer*, 221 Ariz. at 194 ¶ 2, 200 ¶ 28. The court rested its
21 holding upon the simplicity of the design expectations at issue, writing that "[i]n short,
22 most consumers use seatbelts daily and are familiar with their single, safety-related
23 function: keeping belted passengers restrained within a vehicle." *Id.* at 200 ¶ 28. In
24 *Brethauer*, the alleged defect was that the seatbelt became unlatched during an accident.
25 221 Ariz. at 194 ¶ 1. The design expectations relevant to that claim were therefore
26 extremely elementary. In all car accidents save the most extreme, a seatbelt ought to be
27 designed in a manner that prevents it from becoming unlatched. In contrast, the design
28 expectations in the instant case are quite complicated. Plaintiff does not assert that an

ordinary consumer of ADAS technology expects it to prevent every crash. Instead, Plaintiff contends that the ordinary consumer of ADAS technology expects it to prevent collisions in the exact factual circumstances encountered by Mr. Jauregui. But, as noted above, there is simply no evidence supporting that proposition. In the absence of a reason to diverge from the holding in *Maywald*, the Court finds that it guides the outcome here.

Thus, for more than one reason, the consumer expectation test is inapplicable here. Plaintiff's design defect claims must proceed under the risk/benefit analysis. As Plaintiff's motion for partial summary judgment depends upon the availability of the consumer expectation test, the Court must deny her motion.

### B. Defendants' Motions for Summary Judgment

Defendants request summary judgment on all of Plaintiff's claims. The Court addresses each in turn.

#### 1. Plaintiff's Design Defect Claims

The risk/benefit analysis poses the question of whether, in light of seven non-exhaustive factors, the benefits of a challenged design outweigh the risk of danger inherent in that design. *Golonka*, 204 Ariz. at 581 ¶ 14 & n.2. If the answer to that question is no, then the design is defective and unreasonably dangerous. *Id.* Plaintiff argues that the Wingman Fusion is defectively designed because it incorporates an algorithm that gives undue weight to the avoidance of false alerts and unnecessary breaking at the expense of collision mitigation, particularly at higher speeds of travel. Although Plaintiff states repeatedly that the accident in this case "was more likely than not the direct result of a defective algorithm," (*see* Doc. 183 at 2), she never describes in any detail what was wrong with the algorithm beyond the broad assertion that it overvalues the avoidance of false alerts at high velocities. The closest that Plaintiff comes to identifying the algorithm's allegedly defective design is her quotation of Bendix's deponent's statement that Bendix intends the Wingman Fusion to issue "[l]ess than one false warning per 1,000 miles [and] less than one false braking in 5,000 miles." (*See* Doc. 183 at 15; Doc. 184 ¶ 34; Doc. 184-2

Ex. 12 at 78.)[2] Compounding the mushiness of Plaintiff's identification of the challenged design is the fact that Plaintiff never identifies a purportedly less risky alternative design. Although Plaintiff is unsparing in her criticism of the Wingman Fusion's alleged over-emphasis on the avoidance of false positives, at no point does Plaintiff ever submit an alternative quantum of prioritization.

The reason for the absence of a more particularized description of the allegedly defective algorithm is that Plaintiff never sought production of the algorithm in discovery. Plaintiff maintains that she requested information regarding the Wingman Fusion's algorithm by noticing a deposition that included the algorithm as a testimonial subject and that Bendix refused to disseminate the relevant information, but that assertion is problematic for several reasons. First, Plaintiff cites to a passage in her deposition notice that relates to the component algorithms of Bendix's suppliers, to which Bendix objected on the basis that it lacks access to the proprietary materials of its suppliers. (*See* Doc. 183 at 14.) Second, irrespective of the contents of Plaintiff's deposition notice and Bendix's objection thereto, Plaintiff does not contest that she conducted absolutely no written discovery on Defendants, such as a request that Bendix produce the portions of its algorithm that govern the weighing of false alarms versus collision avoidance. (*See* Doc. 132 at 5–6 ("Importantly, however, Plaintiff served no written discovery to PACCAR (or Bendix) in this case."); Doc. 142 at 6 ("Despite bearing the burden of proof, Plaintiff did not serve any requests for production or interrogatories on Bendix in this case, nor did she ask to see the algorithm.").) Plaintiff also does not explain why she failed to conduct third-party discovery on Bendix's suppliers, such as the manufacturer of the Mobileye camera software that Plaintiff herself asserts is materially relevant to her design defect claims. (*See* Doc. 183 at 14–15.) In light of Plaintiff's inexplicable disinterest in the actual parameters of the Wingman Fusion's algorithm, the survival of her claims rests upon her ability to reconstruct the algorithm from circumstantial evidence. (*See* Doc. 183 at 15.)

---

[2] Plaintiff erroneously quotes the relevant testimony as indicating a desire to have fewer than one false *alert* every 5,000 miles, when in fact the deponent stated that the goal was to have fewer than one false *braking* every 5,000 miles.

Plaintiff's attempt at divining the design and alleged defects of the challenged algorithm rests entirely upon the testimony of Plaintiff's expert witness, Tony Gioutsos. (*See* Doc. 183 at 10–11.) However, Mr. Gioutsos's expert opinion fails to adequately establish the design details of the Wingman Fusion's algorithm. The Court discusses the invalidity of Mr. Gioutsos's testimony in greater detail in its simultaneously filed *Daubert* order granting Defendants' motion to exclude his testimony, but the Court provides a condensed version of that analysis here. Plaintiff characterizes Mr. Gioutsos's report as establishing (1) that the Wingman Fusion's algorithm incorporates a hard shut-off function that precludes it from undertaking collision avoidance actions at speeds over fifty miles per hour, (2) that a properly designed ADAS system would employ "fuzzy logic" instead of a hard shut-off function, and (3) that this fuzzy logic's false-positive threshold would be set at some undefined parameter higher than the parameter that Bendix utilizes. (*See* Doc. 183 at 10–11.) Plaintiff's description of Mr. Gioutsos's expert report overstates the reliability thereof. Mr. Gioutsos did not and could not opine that the Wingman Fusion embraces a hard shut-off function, as he never inspected the algorithm. Instead, he wrote that it "seemed" like the Wingman Fusion had a shut-off function based upon a different analyst's conclusion that a different Bendix product might have such a function. (*See* Doc. 132-12 at 30 & n.10.)[3] Likewise, Mr. Gioutsos did not and could not opine that the Wingman Fusion lacks fuzzy logic, as he never actually saw the algorithm's logic. For the reasons explained in the Court's simultaneously filed *Daubert* order, Mr. Gioutsos's expert report is an insufficient evidentiary basis upon which to identify the challenged design and the alleged defects therewith.

A concrete description of the "challenged design" is generally a crucial prerequisite to performance of the risk/benefit analysis. *See Golonka*, 204 Ariz. at 581 ¶ 14. Without a fact-specific challenged design, as well as a fact-specific alternative design, a jury would be hard-pressed to conduct the risk/benefit analysis as laid out by the Arizona judiciary. In the absence of a methodologically sound description of the Wingman Fusion's allegedly

---

[3] Plaintiff also directly cites to this study, which analyzed the Wingman Advanced, not the Wingman Fusion. (*See* Doc. 187 at 4–5.)

defective algorithm, Plaintiff's legal theory essentially rests upon the doctrine of *res ipsa loquitur*.[4] Despite the veneer of scientism provided by Mr. Gioutsos's report, Plaintiff's argument boils down to the assertion that the Wingman Fusion *must* be defective in some way because it failed to prevent a collision that it ought to have prevented. (*See* Doc. 187 at 4 (stating that Plaintiff and her expert "relied on something even more revealing than the algorithm itself—how it performed" and arguing that "[i]ts failure to perform in the present matter is evidence that the algorithm is defective" (emphasis omitted)).) Although neither party uses the phrase "*res ipsa*" or cites to cases discussing the doctrine, the parties do engage with the substance thereof. Throughout their briefing, particularly in their *Daubert* motions, Defendants assert that it is impermissible under Arizona law to infer the existence of a defect simply by virtue of the occurrence of an accident. (*See, e.g.*, Doc. 132 at 11–12.) Defendants are wrong. In Arizona, "[a] plaintiff may also use a *res ipsa loquitur* type of inference to prove the existence of a defect in a strict liability case." *Cox v. May Dep't Store Co.*, 183 Ariz. 361, 364 n.2 (Ct. App. 1995) (citing *Dietz v. Waller*, 141 Ariz. 107, 110–11 (1984)). Similarly, Defendants repeatedly insist that Plaintiff's lawsuit involves an attempt to assign liability to Defendants for not designing a product that prevents every conceivable accident. Again, Defendants are wrong. Plaintiff's theory is not that Defendants bear liability because the Wingman Fusion cannot prevent all accidents, but instead that Defendants bear liability because the Wingman Fusion failed to prevent the exact accident that occurred in this case. (See Doc. 183 at 2 ("This accident was not an outlier; it was **the** accident the system's Operator's Manual describes it as being capable of avoiding." (emphasis in original)).)

Importantly, however, *res ipsa* is not available upon a plaintiff's mere invocation. In strict liability cases, as in negligence cases, a plaintiff may not rely on the doctrine of *res ipsa* when there is more than one possible proximate cause of the underlying accident

---

[4] *Res ipsa loquitur*, frequently shortened to *res ipsa*, is a Latin phrase that means "the thing speaks for itself." It describes the "doctrine providing that, in some circumstances, the mere fact of an accident's occurrence raises an inference of [liability] that establishes a prima facie case." *See Res Ipsa Loquitur*, Black's Law Dictionary (12th ed. 2024).

- 15 -

and such proximate causes are mutually exclusive. *See Cook v. Hawkins*, No. 1 CA-CV 18-0399, 2019 WL 2442263, at *3 ¶¶ 14, 17 (Ariz. Ct. App. June 11, 2019). In *Cook*, the Arizona Court of Appeals rejected the plaintiff's reliance on *res ipsa* for his strict liability claim for the same reasons that the court rejected his reliance thereon for his negligence claim, which the court explained as follows:

> Here, the Cummings Declaration offered two independent possible causes for the implant's failure: (1) negligence by Hawkins in installing the implant (failing to properly size or lock the tibial insert) or (2) a defect in the locking mechanism of S&N's device. Cook thus cannot invoke *res ipsa* against Hawkins because, based on the Cummings Declaration, a defect in S&N's device could have been the sole cause of the injury (without any negligence by Hawkins); conversely, Cook cannot invoke *res ipsa* against S&N because, based on the Cummings Declaration, Hawkins's negligence alone could have caused the injury (without a defective S&N product). *See Sanchez*, 220 Ariz. at 40–41, ¶¶ 14–15 (holding that the plaintiff could not invoke *res ipsa* against two defendants when the plaintiff was unable to specify the mechanism of injury and simply asserted that either one or the other defendant negligently caused the injury, but not that either *probably* did so) [parenthetical omitted]. Even discounting the alternative, non-negligent explanations offered by S&N and Hawkins, Cook's offer of two independently sufficient potential causes for the implant's failure (based on different negligence at different times by different parties) means that Cook failed to present evidence sufficient to support an inference that either individual defendant's negligence was probably responsible for Cook's injuries.

*Id. Cook* is not perfectly on point, but the Court finds that the principles set forth therein render Plaintiff's implicit appeal to *res ipsa* unavailing in the instant case.

Here, as in *Cook*, Plaintiff's legal theory involves "two independently sufficient potential causes for the [product's] failure." *See* 2019 WL 2442263, at *3 ¶¶ 14, 17. As both Plaintiff and her expert concede, the Wingman Fusion's non-activation could have been caused by an allegedly improperly calibrated algorithm *or* the inability of the system's sensors to perceive the stalled truck in the first place. The Court discusses this issue in detail in its simultaneously filed *Daubert* order excluding Mr. Gioutsos's testimony, but the Court need not repeat that analysis here because Plaintiff expressly concedes in her

1 summary judgment briefing that the inherent limitations of the Wingman Fusion's camera
2 sensors might be the reason that the system did not issue an alert or automatically brake.
3 (*See* Doc. 183 at 11–12; Doc. 187 at 7.) Although Plaintiff asserts that the algorithm's
4 alleged defect was "more likely than not" the proximate cause of Mr. Jauregui's death, that
5 statement is unsupported by the record. As the Court discusses in greater detail in its
6 *Daubert* order, there is no basis upon which to conclude that the algorithm was more or
7 less likely than the camera hardware to have been the cause of the collision.

8       To be clear, the parties agree that the camera hardware is a potential explanation of
9 the Wingman Fusion's non-activation in this case. (*See* Doc. 183 at 11–12; Doc. 185 at 11.)
10 The parties' disagreement concerns whether the camera's limitations constitute a defect or
11 instead simply a neutral characteristic of the Wingman Fusion. Plaintiff contends that the
12 Wingman Fusion's choice of camera is defective because the system utilizes the allegedly
13 "archaic" Mobileye EyeQ2, which was released in 2010, instead of a more recent Mobileye
14 product, such as "at a minimum" the EyeQ3. (*See* Doc. 183 at 11–12.) The sole rationale
15 supporting Plaintiff's assertion of defectiveness is Mr. Gioutsos's contention that the
16 Wingman Fusion ought to have employed the EyeQ3 "at a minimum." However, that
17 expert statement by Mr. Gioutsos is patently unreliable and thus inadmissible. Mr. Gioutsos
18 grounds his criticism of the EyeQ2 on two things: (1) the bare fact that it is from 2010 and
19 (2) a screenshot of a marketing infographic from Mobileye's website showing that the
20 EyeQ2 was used in 2010 by Volvo for "Pedestrian [Automatic Emergency Braking]," in
21 2011 by GM and Volvo for "Camera-only [Forward Collision Warning]," and in 2013 by
22 BMW for "Camera-only [Adaptive Cruise Control]," whereas the EyeQ3 was used in 2014
23 by Audi for "Camera-only [Automatic Emergency Braking]." (*See* Doc. 132-12 at 33–35.)
24 Mr. Gioutsos's report contains no analysis of the third-party advert upon which it relies
25 and no additional explanation of the EyeQ2's deficiencies. His statement that "the EyeQ2
26 is never stated by Mobileye to be used for full AEB [yet] EyeQ3 is stated that it could be
27 used for AEB, even as a standalone" is not supported by the marketing screenshot, which

is the statement's sole source of substantiation, and is thus unwarranted by any reliable data or methodology.

No reasonable juror could find that the Wingman Fusion's incorporation of the EyeQ2 camera renders the system defective, as there is no competent evidence supporting that conclusion. Mr. Gioutsos's unsupported say-so is insufficient. The unadorned fact that the camera is from 2010 and the uninformative Mobileye marketing materials constitute the "scintilla of evidence" and "metaphysical doubt" that federal courts have warned is insufficient to withstand a motion for summary judgment. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Therefore, Plaintiff may not rely on *res ipsa*. That doctrine is only available when a plaintiff establishes that, *inter alia*, the asserted defect was *probably* the proximate cause of the accident. Here, Plaintiff cannot so show. She has identified two potential proximate causes, neither one of which is more likely than not the reason that the Wingman Fusion did not activate in the collision. In *Cook*, the plaintiff offered "two independently sufficient potential causes for the [product's] failure" based upon two different purported defects created by two distinct parties. Here, Plaintiff offers two independently sufficient potential causes for the Wingman Fusion's non-activation, both of which pertain to the same party, but only one of which could reasonably be found to constitute a defect. It is conceivable that a reasonable jury could find the Wingman Fusion's algorithm to be defectively designed on the basis of *res ipsa* reasoning, despite the fact that Plaintiff has not meaningfully described the algorithm, its purported defect, or any alternative design.[5] However, such a finding of fact depends as a matter of law upon an antecedent showing by a preponderance of the evidence that the allegedly defective

---

[5] The Court rejects several of Defendants' secondary arguments as meritless, such as their argument that an inoperative safety feature cannot render an otherwise safe vehicle defective, (*see* Doc. 137 at 6–7), as well as their argument that Plaintiff lacks evidence that Mr. Jauregui might have reacted to an alert, had one been issued, (*see* Doc. 137 at 13). Regarding the former argument, Arizona caselaw clearly establishes that an otherwise safe vehicle can be defective based upon the absence of an additional safety feature. *See Maywald*, 2024 WL 5165445, at *4 ¶ 21. It therefore follows that an otherwise safe vehicle can be defective based upon an extant but dysfunctional additional safety feature. Regarding the latter argument, the Court explains in its simultaneously filed *Daubert* order addressing the parties' human factors experts why Plaintiff's evidence is sufficient.

design proximately caused the accident. That condition precedent is not satisfied here.[6] The Court expresses no opinion on what outcome would obtain under Arizona law if the record in this case were capable of supporting a finding of fact that the camera is defective. Such a scenario might render *Cook* distinguishable, but the Court need not resolve that hypothetical issue.

In sum, there is insufficient evidence upon which a jury could reasonably find that the Wingman Fusion's algorithm is defective under the normal risk/benefit analysis. That conclusion alone is not fatal to Plaintiff's design defect claims, as *res ipsa* can function as the legal underpinning of a strict liability claim. However, *res ipsa* is not available to Plaintiff in this case, as there are at least two independently sufficient potential proximate causes of the accident, only one of which a reasonable jury could find constitutes a defect upon this record. Defendants are therefore entitled to summary judgment on Plaintiff's design defect claims.

At bottom, Plaintiff's legal theory is not so much that the Wingman Fusion was defectively designed, but instead that it was defectively advertised. Throughout her briefing, many of her arguments rest upon purported inconsistencies between how the Wingman Fusion actually performed and how Bendix claims it performs. For instance, Plaintiff writes that:

> Plaintiff Sandra Jauregui's husband died in a rear-end collision in his model year 2022 Peterbilt, a collision that fell squarely within the class of collisions *that the Bendix Fusion Operator's Manual says it will avoid or mitigate the severity of*. Yet it did not function at all, neither giving a warning or applying preventative braking, and the decedent, Jose Jauregui, died as a proximate result of the Fusion system not doing *what its Operator's Manuals says it does*.

---

[6] Even if Plaintiff had proffered enough evidence to demonstrate the impropriety of the EyeQ2 camera, which she has not, there would be an additional problem. She has adduced no evidence of any kind regarding the feasibility, whether financial or technical, of redesigning the Wingman Fusion to incorporate a different camera. Although she writes that "Mr. Gioutsos has provided information that alternative CAT systems are technologically feasible at no cost increase," (Doc. 187 at 16), that statement is simply not true, as indicated by its lack of a supporting citation. As explained in the Court's simultaneously filed *Daubert* order, Mr. Gioutsos did not provide such information.

- 19 -

(Doc. 183 at 2 (internal citation, emphasis, and parenthetical omitted) (emphasis added).) Irrespective of whether Plaintiff is correct that an injustice occurred here, she has failed to marshal sufficient evidence to support her design defect claims. To the extent that there exists a claim for something akin to an informational defect or false advertising, she has failed to demonstrate that she is a proper plaintiff regarding such a claim. As noted, there is no evidence that Mr. Jauregui ever relied upon anything in Bendix's operating manual or other published literature.

### 2. Plaintiff's Other Claims

Plaintiff does not respond to Defendants' contention that there exists no evidence of any kind supporting her manufacturing defect claims. The Court therefore construes Plaintiff as having abandoned these claims, and Defendants are accordingly entitled to summary judgment thereon.

Defendants are also entitled to summary judgment on Plaintiff's negligence claims, as Plaintiff's only defense of those claims rests on the "same reasons" that she contends save her design defect claims. (*See* Doc. 187 at 15.) Thus, the Court awards summary judgment to Defendants in full.[7]

**IT IS THEREFORE ORDERED** granting Paccar's Motion for Summary Judgment (Doc. 137), granting Bendix's Motion for Summary Judgment (Doc. 142), and denying Plaintiff's Motion for Partial Summary Judgment (Doc. 139).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment for Defendants and close this case.

Dated this 25th day of March, 2025.

Honorable John J. Tuchi
United States District Judge

---

[7] Because the Court rules in Defendants' favor on the merits, the Court need not address Defendants' argument that they are entitled to summary judgment on procedural grounds resulting from Plaintiff's failure to comply with Local Rule 56.1(b)'s requirement that a party opposing summary judgment "must" file a controverting statement of facts. (*See* Doc. 195 at 2; Doc. 198.)